No. 24-11951-J

═══════════════════════════════

## IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

───────────────

**UNITED STATES OF AMERICA,**

*Plaintiff/appellee,*

**v.**

**STEVEN SCHRECK
a/k/a EUGENE SANDBURG,**[1]

*Defendant/appellant.*

───────────────

**On Appeal from the United States District Court for the Southern District of Florida**

───────────────

## INITIAL BRIEF BY APPELLANT EUGENE SANDBURG

───────────────

HECTOR A. DOPICO
 INTERIM FED. PUBLIC DEFENDER
ANDREW L. ADLER
 ASS'T FEDERAL PUBLIC DEFENDER
Counsel for Appellant
 1 E. Broward Blvd., Suite 1100
 Ft. Lauderdale, FL 33301
 (954) 356-7436

## THIS CASE IS ENTITLED TO PREFERENCE (CRIMINAL CASE)

═══════════════════════════════

───────────────

[1] As explained below, the appellant's birth name is Steven Schreck. However, he legally changed his name to Eugene Sandburg in 1988 and goes by that name. Accordingly, this brief refers to him as Mr. Sandburg.

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## United States v. Steven Schreck/Eugene Sandburg
## Case No. 24-11951-J

Appellant files this Certificate of Interested Persons and Corporate

Disclosure Statement, as required by 11th Cir. R. 26.1.

Adler, Andrew L.

Cannon, Aileen M.

Caruso, Michael

Cohn, James I.

Galler, Brandy

Gonzalez, Juan Antonio

Lapointe, Markenzy

Matzkin, Daniel

Nash, Aisha Ashley

Nkrumah, Kafahni

Porter, Michael D.

Rubio, Lisa Tobin

Schreck, Steven/Sandburg, Eugene

United States of America

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

As explained below, this case presents interesting questions of first impression about 18 U.S.C. § 1542, which prohibits making false statements in a passport application as well as "using" a passport secured by false statements. Accordingly, Mr. Sandburg requests oral argument.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF CITATIONS ............................................................. iii

STATEMENT OF JURISDICTION ..................................................1

STATEMENT OF THE ISSUES.....................................................2

INTRODUCTION.....................................................................3

STATEMENT OF THE CASE ......................................................4

   I.    Course of Proceedings & Disposition Below ...............................4

   II.   Facts ...........................................................................5

   III.  Standards of Review ........................................................11

SUMMARY OF THE ARGUMENT .................................................12

ARGUMENT AND CITATIONS TO AUTHORITY ................................13

   The evidence was insufficient to support the § 1542 convictions......13

   A.    The evidence was insufficient for Count One. ..........................13

       1.   *Browder* requires that "use" of a passport be in travel ....14

       2.   "Use" requires active, non-ancillary employment ...........16

       3.   Federal penal statutes must be strictly construed...........23

       4.   The government's theory fails legally and factually.........23

   B.    The evidence was insufficient for Count Two ...........................28

       1.   An official passport is not a "false document"..................29

       2.   The evidence was insufficient as to *mens rea* ..................32

CONCLUSION .......................................................................34

CERTIFICATE OF COMPLIANCE....................................................36

CERTIFICATE OF SERVICE.........................................................37

# TABLE OF CITATIONS

## **Cases**

*Bailey v. United States*,
    516 U.S. 137 (1995)..........................................................................21, 25

*Browder v. United States*,
    312 U.S. 335 (1941)......................................... 14–16, 18, 21–24, 26, 32

*Dubin v. United States*,
    559 U.S. 110 (2023).................................................... 16–18, 21–22, 24

*Jones v. United States*,
    529 U.S. 848 (2000).......................................................................20, 25

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)...........................................................................18–19

*United States v. Louis*,
    86 F.3d 1330 (11th Cir. 2017)..............................................................11

*United States v. O'Bryant*,
    775 F.2d 1528 (11th Cir. 1985)...........................................................32

*United States v. Shamsid-Deen*,
    61 F.4th 935 (11th Cir. 2023) .............................................................11

*United States v. Wilson*,
    512 F. App'x 75 (2d Cir. 2013) .....................................................23–25

*Van Buren v. United States*,
    593 U.S. 374 (2021)............................................................................24

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
    586 U.S. 9 (2018)................................................................................29

## **Statutes**

18 U.S.C.
   § 924(c) ................................................................................. 21
   § 1542 ...............................................i, 2–4, 12–14, 16, 18, 22–24, 26, 28
   § 3231 .................................................................................... 1
28 U.S.C. § 1291 .......................................................................... 1

## **Rules**

Fed. R. Crim. P. 29 ..................................................................... 10

## **Other Authorities**

U.S. Dep't of State—Bureau of Consular Affairs,
   U.S. Passports, Passport Help, Frequently Asked Questions ............ 26

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because the defendant was charged with offenses against the laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291, which confers jurisdiction on the courts of appeals from final decisions of district courts. Mr. Sandburg timely noticed an appeal on June 10, 2024 (DE 71) from the district court's final judgment entered on May 30, 2024 (DE 70).

## STATEMENT OF THE ISSUES

**I.**     Whether the evidence was sufficient to support a conviction under 18 U.S.C. § 1542 for "using" a passport secured by false statements merely by submitting such a passport along with a renewal application.

**II.**     Whether the evidence was sufficient to support a conviction under 18 U.S.C. § 1542 for making a false statement on a passport renewal application where the applicant affirmed that he had not included any "false documents" and then included an authentic, official government passport that contained inaccurate information.

## INTRODUCTION

In 1977, 1988, 1999, and 2011, Mr. Sandburg made false statements to obtain and renew his passport. In 2021, he applied to renew his passport again. But this time he was entirely truthful. All of the information that he put on the form was correct. This alerted the government that he had made false statements in his previous applications. But the government did not prosecute him for *those* false statements; the statute of limitations had expired. So the government prosecuted him for his most recent application—where he told the truth.

To do so, the government came up with two novel theories of liability under 18 U.S.C. § 1542. First, the government alleged that Mr. Sandburg "used" his passport (which had been secured by false statements) merely by submitting it along with his renewal application. Second, the government alleged that he made a false statement on that application by affirming that he had not submitted any "false documents" and then submitting his official passport (which contained inaccurate information). Critically, the renewal application *required* him to submit his expired passport. The ultimate irony here, then, is that Mr. Sandburg was convicted for *honestly* completing the passport renewal application.

3

## STATEMENT OF THE CASE

### I.     Course of Proceedings & Disposition Below

Mr. Sandburg was charged with two offenses stemming from a 2021 application to renew his passport. (DE 1). Count One charged him with willfully and knowingly using a passport that had been secured by a false statement, in violation of the second paragraph of 18 U.S.C. § 1542. (*Id*. at 1). The allegation was that Mr. Sandburg "used" his passport (which admittedly had been secured by false statements) by submitting it with his passport renewal application. Count Two charged him with willfully and knowingly making a false statement in the application, in violation of the first paragraph of § 1542. (*Id*. at 2). The allegation was *not* that Mr. Sandburg had made any false statement in the application form itself. Rather, the allegation was that Mr. Sandburg falsely affirmed that he had not included any "false documents" in support the application, and the passport he attached contained an incorrect place and date of birth.

Mr. Sandburg proceeded to trial over the course of two days. The government called three witnesses. Mr. Sandburg testified on his own behalf. A jury ultimately found him guilty of both counts. (DE 51).

The parties agreed that a probationary sentence was appropriate. At sentencing, the district court found that Mr. Sandburg's trial testimony was "truthful," and that "[e]verything in the application itself was truthful." As a result, the court determined that, despite going to trial, acceptance of responsibility was warranted. (DE 80:5–6, 8–9, 11). And it found that, while Mr. Sandburg had made misrepresentations in earlier passport applications, his "motive" this time was "pure," in that he simply "want[ed] to correct all past misinformation." (*Id*. at 18). The district court sentenced him to one year of probation. (*Id*. at 20; DE 70).

## II.    Facts

The material facts are undisputed and are fit for a motion picture.

The defendant was born on December 7, 1946, in Newark, New Jersey, under the name Steven Schreck. He is currently 77 years old. He has been a upstanding Florida resident for the last four decades.

He has come quite a long way. In 1977, he was an inmate in Oregon. While working an outside job, he walked way and escaped from custody. He made his way to Kansas and then Michigan in an effort to start a new life. To do so, though, he realized that he would need a new identity. While he was in Kansas City, he saw a death notice in the newspaper for

a man named Hervey Eugene Sandburg, and he adopted that identity (going by Eugene). He was able to secure a driver's license, along with other documentation, and restarted his life under that new name.

That same year, 1977, he met Kathy. They got married (and remain so today), bought a house, and started a family. And they wanted to travel. So he applied for and obtained a passport under the name Hervey Eugene Sandburg. To do so, he appeared in person with a driver's license and birth certificate in that name. He also used the place and date of birth of the deceased Sandburg: Kansas City; June 7, 1944. There is no dispute that this passport was secured through false statements. But those false statements do not form the basis of the charges in this case.

In 1983, Mr. Sandburg was arrested for the prison escape, served six months in prison, and completed five years of probation. By 1988, he had been living under the name Eugene Sandburg for a decade and had a wife and children under that name. So he obtained permission to legally change his name to Eugene Sandburg. In the early 1990s, he also began the process of switching out the decedent's social security number, which he had been using, for the social security number he was given at birth.

In 1988, 1999, and 2011, Mr. Sandburg renewed his passport by mail. By the time of the 1999 and 2011 renewals, his name was legally changed to Eugene Sandburg, and he used that correct name on the form. He also used his correct social security number rather than the decedent's, and this did not raise any questions. However, he continued to use the place and date of birth belonging to the deceased Sandburg. He testified he just "didn't even think about" it. (DE 79:30). So there is also no dispute that these renewal applications contained false statements. But those false statements also do not form the basis of the charges here.

By 2021, Mr. Sandburg had corrected all of his documentation to reflect his true information—except for his passport. After returning from an overseas trip during the pandemic, his wife advised him that the date of birth on the passport did not match the date of birth on his driver's license. In April 2021, Mr. Sandburg submitted by mail the renewal application that formed the basis of the charges here. This time, he included his correct place and date of birth. In his trial testimony, he explained that he did so because he wanted everything to be correct: "If I just wanted a passport, I would have sent in $110 like the other ones, and

they would have mailed one, don't change anything, here is the new one. I wanted it corrected, my wife wanted it corrected." (DE 79:34).

There were four pages of instructions explaining how to fill out the renewal form as well as eligibility to use it. As to eligibility, there were several criteria, all of which Mr. Sandburg satisfied. The first criterion was whether the applicant "can submit my most recent U.S. passport book . . . with this application." (DE 58-7, Exh. 9:1). The instructions also directed the applicant to mail in his most recent passport (as well as a fee and recent color photograph). (*Id*. at 2). Accordingly, he submitted his expired passport, which still listed the wrong place and date of birth.

At trial, a fraud prevention manager at the passport agency testified that, in order to renew using that form, submitting the most recent passport was "mandatory." (DE 78:154). (A different form is required if a passport is lost, stolen, etc…). She further explained that, to obtain an original passport, the applicant must appear in person and provide proof of identity and citizenship. If a passport is issued, it then serves as proof of identity and citizenship. This explains why an applicant can renew by mail rather than in person; the passport itself serves as proof of identity and citizenship. However, nothing in the instructions or

the form informed the applicant that the passport was being used to prove identity and citizenship. Unlike the application for an original passport, the renewal form does not have a box to check for evidence of citizenship. (*Id*. at 139–42). The passport agency manager further acknowledged that, because nothing explicitly informed the applicant that the passport was being submitted for proof of identity/citizenship, it was possible that the applicant would not know this. (*Id*. at 151).

In fine print, the renewal application form contained five representations that the applicant was required to affirm through his signature. One of them provided that the applicant had "not knowingly and willfully made false statements *or included false documents* in support of this application." By signing his name on the 2021 renewal application, Mr. Sandburg affirmed that he had not. (DE 58-4, Exh. 6:4).

Mr. Sandburg's renewal application was flagged because the place and date of birth on the 2021 application did not match the place and date of birth on his previous applications. Due to that discrepancy, a special agent with Diplomatic Security in the State Department went to Mr. Sandburg's home and interviewed him. The agent testified that Mr. Sandburg was "very straightforward." (*Id*. at 121, 130). Mr.

Sandburg testified that he "explained the whole story from day one to the present time," and that he "wasn't lying" in his latest application but was "trying to correct my mistakes." (DE 79:32–33). He admitted to using someone else's information to obtain his original passport; although he knew it was illegal, he "did not care" at that time because he was then trying to start over and "go straight." (DE 78:121–22; DE 79:33, 50–51).

Mr. Sandburg moved for a judgment of acquittal under Rule 29. As to Count One, he argued that, although his attached passport had been secured by false statements, the evidence was insufficient to prove that he "willfully and knowingly used" it merely by submitting it along with his renewal application, emphasizing that the form required him to submit it. As to Count Two, he argued that the evidence was insufficient to prove that he willfully and knowingly made a false statement in his 2021 renewal application (as opposed to his earlier applications) merely by submitting his expired passport. He further argued that the evidence was insufficient to prove that this passport was a "false document" because there was no evidence that the "document itself was false." The district court denied Mr. Sandburg's Rule 29 motion. (DE 79:3–5, 8, 53).

## III.   Standards of Review

 "It is well settled that questions of statutory construction are legal determinations that [this Court] review[s] *de novo*." *United States v. Shamsid-Deen*, 61 F.4th 935, 946 (11th Cir. 2023).

This Court also "review[s] *de novo* a district court's denial of a motion for acquittal. When considering claims regarding sufficiency of the evidence, we view the evidence in the light most favorable to the government. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Louis*, 86 F.3d 1330, 1333 (11th Cir. 2017) (citations omitted).

## SUMMARY OF THE ARGUMENT

The evidence was insufficient to sustain the § 1542 convictions.

Count One alleged that Mr. Sandburg "used" his expired passport by submitting it along with his renewal application. But Supreme Court precedent establishes that the statute only prohibits use "in connection with travel"; that is the crux of the offense. And that limiting construction is bolstered by a line of Supreme Court precedents strictly interpreting "use" to require active employment for a non-ancillary purpose. Here, there was no allegation that Mr. Sandburg used his passport for travel; all he did was follow the instructions on a form. At the very least, he did not "willfully and knowingly" use his passport in a prohibited manner.

Count Two alleged that Mr. Sandburg made a false statement by affirming that he had not submitted any "false documents" with his form. But his official, authentic passport was not a "false document." The form could have referred to a "document containing false information" but did not. At the very least, the evidence at trial was insufficient to prove that he "willfully and knowingly" submitted a false document merely by following the application's instructions to submit his expired passport.

Accordingly, Mr. Sandburg's § 1542 convictions should be reversed.

12

## ARGUMENT AND CITATIONS TO AUTHORITY

**The evidence was insufficient to support the § 1542 convictions.**

The evidence was insufficient to support the conviction in Count One because Mr. Sandburg did not "willfully and knowingly use" a passport within the meaning of § 1542. And the evidence was insufficient to support the conviction in Count Two because Mr. Sandburg did not "willfully and knowingly" submit a "false document" with his application. Accordingly, this Court should reverse both of his § 1542 convictions.

### A.    The evidence was insufficient for Count One.

The second paragraph of § 1542 makes it a crime, punishable by up to 10 years in prison, to "willfully and knowingly use[ ] or attempt[ ] to use, or furnish[ ] to another for use any passport the issue of which was secured in any way by reason of any false statement." In this case, there is no dispute that Mr. Sandburg secured his passport by false statements. Rather, the only dispute is whether he "willfully and knowingly used" that passport by submitting it with his renewal application, as the application required. Although this appears to be a question of first impression in any jurisdiction, Supreme Court precedent compels the conclusion that Mr. Sandburg's conduct did not violate the statute.

13

### 1. *Browder* requires that "use" of a passport be in travel.

In *Browder v. United States*, 312 U.S. 335 (1941), the Supreme Court interpreted the predecessor to § 1542, which contained the same statutory language at issue here. *Id*. at 335 n.1. The issue was "whether the use by an American citizen of a passport obtained by false statements to facilitate reentry into the United States is a 'use' within" the meaning of the statute, "and, if so, whether petitioner was properly convicted of a 'willful' use." *Id* at 335–36. As for that latter issue, the Court explained that "willfully and knowingly" meant "deliberately and with knowledge and not something which is merely careless or negligent or inadvertent." *Id*. at 341. It did not require an "evil purpose in mind." *Id*. at 341–42.

As to "use," the Court endorsed the *government's* understanding that not "every use of a fraudulent passport is violative of the act but only those 'uses in connection with travel which are a part of the ordinary incentives for obtaining passports.'" *Id*. at 338. "Certainly," the Court continued, "the use to prove citizenship on reentry to the country is within the ordinary incentives." *Id*. In its final sentence of analysis, the Court reiterated: "Once the basic wrong under this passport statute is

14

completed, that is the securing of a passport by a false statement, any intentional use of that passport in travel is punishable." *Id*. at 342.

*Browder* establishes two key points here. First, not "every use" of a fraudulent passport violates the statute. Otherwise, using a fraudulent passport as a drink coaster or to stabilize a wobbly table would be a crime. While such "uses" would presumably never be prosecuted, they illustrate that there must be some limit on what uses qualify. The question then becomes: what is that limit? And *Browder* answers that question too: those uses that occur "in connection with travel." *Id*. at 338; *see id*. at 342 ("any intentional use of that passport *in travel*") (emphasis added). Thus, any use of a passport to travel abroad or to reenter the country is covered. That limitation makes perfect sense; those uses are why people acquire passports. *See id*. at 338 ("ordinary incentives for obtaining passports").

In this case, however, the government did not even allege that Mr. Sandburg used a fraudulent passport in connection with travel. For example, the government did not allege that he used the passport to travel abroad or to re-enter the country. Rather, the government alleged only that he "used" a fraudulent passport by submitting it along with his 2021 passport renewal application, as the application directed him to do.

15

That does not qualify as "use" under the statute. Quite the opposite: he submitted an *expired* passport (DE 78:115), which could no longer be used to travel abroad; and he was *relinquishing control* of that expired passport, preventing him from even attempting to use it for travel.

### 2.    "Use" requires active, non-ancillary employment.

A line of Supreme Court precedents interpreting the word "use" in other federal statutes bolsters *Browder*'s limiting construction of § 1542, as well as the conclusion that it does not cover the conduct in this case.

"As the [Supreme] Court has observed more than once, the word 'use' poses some interpretational difficulties because of the different meanings attributable to it." *Dubin v. United States*, 559 U.S. 110, 118 (2023) (quotations omitted). In the dictionary, "[t]he ordinary or natural meaning of use is variously defined as 'to convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.' These various definitions of 'use' imply action and implementation. Beyond that general concept, however, 'use' takes on different meanings depending on context.'" *Id*. (cleaned up). "It is statutory context, therefore, that determines what kind of active employment or conversion to one's service" is contemplated. *Id*. at 119.

16

**a.** In *Dubin*, the Court most recently applied this lesson when interpreting the federal aggravated-identity theft statute. That statute prohibits "using" someone's identity in relation to predicate offenses—in that case, healthcare fraud by overbilling Medicaid. The Court rejected the government's "boundless" argument that "use" meant to "employ[ ] in any sense," such that the statute would "apply automatically any time a name or other means of identification happens to be part of the payment or billing method used in the commission of a long list of predicate offenses. In other words, virtually all the time." *Id*. at 114, 117, 128. Instead, the Court limited the qualifying "uses" to those that were "at the crux" of the predicate offense "rather than merely an ancillary feature of a billing method." *Id*. at 114; *see id*. at 117–18, 123, 129. In that case, "the crux of petitioner's overbilling was inflating the value of services actually provided, while the patient's means of identification was an ancillary part of the Medicaid billing process." *Id*. at 114; *see id*. at 132.

To reach that conclusion, the Court relied on the "ordinary understanding of identity theft." *Id*. at 120. And that "understanding . . . support[ed] a more targeted definition of 'uses.'" *Id*. at 123. In that context, "identity theft is committed when a defendant uses the means of

17

identification itself to defraud or deceive." *Id*. It was not enough, the Court explained, for the means of identification to "facilitate" the predicate offense, or to serve as a "but-for cause of its success." *Id*. at 131 (quotation omitted). Those "uses" were still too "ancillary" to the offense.

Here, the statutory context is not identity theft but passports. Indeed, "passports" are the exclusive focus of § 1542. And passports are used for international travel. *See Browder*, 312 U.S. at 318–19. That is the ordinary understanding of their purpose and function. Because passports are the only "thing that is 'used" in § 1542, *Dubin*, 599 U.S. at 120 n.4, the statute's reach should be limited to their customary use "in connection with travel," *Browder*, 312 U.S. at 338, 342. Put another way, that use is "the crux" of this offense. By contrast, submitting an expired passport, as directed by a renewal application, is at most "ancillary" to travel. It is therefore not a prohibited "use" under § 1542.

**b.** In *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the Court held that DUI offenses requiring a *mens rea* of negligence did not qualify as a "crime of violence" under a statutory definition requiring the "use" of physical force against the person or property of another. *Id*. at 4, 6, 13. In so holding, the Court reasoned that "'use' requires active employment."

18

*Id.* at 9. And "[w]hile one may, in theory, actively employ *something* in an accidental manner, it is much less natural to say that a person actively employs physical force against another person by accident. Thus, a person would 'use physical force against' another when pushing him; however, we would not ordinarily say a person 'uses physical force against' another by stumbling and falling into him." *Id.* (cleaned up). The Court emphasized that, "[w]hen interpreting a statute, we must give words their ordinary or natural meaning." *Id.* (quotation omitted).

Similar logic applies here too. While one may, in theory, "use" a passport by submitting it with a renewal application, that is not the ordinary or natural meaning of that term. Rather, the ordinary or natural meaning of "use" in the passport context involves presenting a passport to a customs official for purposes of engaging in international travel.

Nor is it ordinary or natural to say that one "actively employs" a passport by returning it at the direction of a form. That is a passive use at best—a step administratively required to complete an application, not a step that applicants would themselves independently undertake. It would be quite strange to say that an applicant "used" his expired passport merely by following an application's instructions to return it.

19

**c.**      In *Jones v. United States*, 529 U.S. 848 (2000), the Court held that the federal arson statute did not apply to an owner-occupied private residence where the residence was not "used" in interstate/foreign commerce or any commerce-affecting activity, as the statute required. *Id*. at 850–51. The Court rejected the government's argument that the residence had been "used" in various ways: as collateral for a mortgage and a loan; to obtain an insurance policy; and to receive natural gas from sources outside the state. *Id*. at 855. The Court explained that "using" property in commerce or commerce-affecting activity "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id*. The Court added: "It surely is not the common perception that a private, owner-occupied residence is 'used' in the 'activity' of receiving natural gas, a mortgage, or an insurance policy." *Id*. at 856. In that case, the "home's only 'active employment . . . was for the everyday living'" of a family. *Id*.

Once again, similar logic applies here. "Using" a fraudulent passport is "most sensibly read to mean active employment" of the passport for travel, not passive submission to complete an application.

20

**d.**    Finally, in *Bailey v. United States*, 516 U.S. 137 (1995), the Court held that mere proximity and accessibility of a firearm to drugs or drug proceeds does not constitute the "use" of a firearm during and in relation to a drug-trafficking crime under 18 U.S.C. § 924(c). *Id.* at 138–39. The Court emphasized that "use" required the "active employment of the firearm." *Id.* at 143–44, 150. Not only was "mere possession" of a firearm at or near the site of a drug offense insufficient; so too was deliberately "conceal[ing] a gun nearby to be at the ready for an imminent confrontation," because "[i]f the gun is not disclosed or mentioned by the offender, it is not actively employed." *Id.* at 143–44, 149.

*Bailey* thus provides further evidence that, in numerous contexts, the Court has strictly interpreted the word "use" and the sort of "active employment" it requires. As explained, the conduct here falls well short.

### 3.    Federal penal statutes must be strictly construed.

Bolstering *Browder* and the "use" precedents summarized above, the Supreme Court has also "traditionally exercised restraint in assessing the reach of a federal criminal statute." *Dubin*, 599 U.S. at 129 (quotation omitted). As the Court recently summarized in *Dubin*: "This restraint arises both out of deference to the prerogatives of Congress and

out of concern that a fair warning should be given to the world in language that the common world will understand of what the law intends to do if a certain line is passed. After all, crimes are supposed to be defined by the legislature, not by clever prosecutors riffing on equivocal language." *Id*. at 129–30 (cleaned up). The Court therefore consistently refuses to "construe a criminal statute on the assumption that the Government will use it responsibly." *Id*. at 131 (quotation omitted).

This case illustrates the wisdom of that skepticism. The government has not pointed to a single previous prosecution under § 1542 or its statutory predecessors—which go back to 1917, *see Browder*, 312 U.S. at 335 & n.1—charging someone with "using" a fraudulent passport merely by submitting it with an application. The novelty of that theory confirms that Congress did not intend to reach such conduct. And, at the very least, ordinary people would not have fair notice that it is covered.

The facts of this case highlight that reality given that Mr. Sandburg was doing his best to honestly complete an application. Again, it is undisputed that every piece of information that he put on the form was correct. His objective was to correct old inaccuracies, not create new ones. That honesty is why the government learned for the first time that his

22

passport had been secured by false statements. And the submission of his expired passport was *required* by the renewal application. Under these circumstances, no ordinary person would suspect that honestly completing the application, and complying with its instructions to submit an expired passport, would constitute a criminal "use" of that passport.

### 4.    The government's theory fails legally and factually.

Despite all of the authority above, the government's theory at trial was that Mr. Sandburg criminally "used" his passport because it served as proof of his identity/citizenship. This theory fails legally and factually.

**a.**    Legally, that theory is overbroad in light of *Browder*. As explained, that case made clear that the "use" must be "in connection with the travel." *Browder*, 312 U.S. at 338, 342. So if someone presents a fraudulent passport to a customs official as proof of identity/citizenship in order to board an international flight, then that use would violate § 1542. But if someone uses a passport as proof of identity for a purpose wholly unrelated to travel, then that use would not violate the statute.

The government's only authority below for the contrary position was *United States v. Wilson*, 512 F. App'x 75 (2d Cir. 2013). Not only is that case unpublished and from out of this Circuit, but its analysis is

23

unpersuasive. In that case, the defendant used a fraudulent passport to open a post office box in connection with a credit card scheme. *Id*. at 77. The Second Circuit concluded that, because § 1542's plain language "does not refer to travel," the statute was not so limited. But while the court included a "see" citation to *Browder*, it did not address the "travel" language upon which Mr. Sandburg relies here, and the court's pin-cite to *Browder* referenced a page where the travel language does not appear. Nor did that court address any of the "use" precedents discussed above.

In addition to those fatal omissions, the court expressly declined to address "whether there are *any limits* on the ways in which a fraudulently obtained passport may be 'used' in violation of the statute." *Id*. (emphasis added). But there obviously must be *some* limits; again, otherwise the statute would be violated by using a fraudulent passport as a coaster. The Supreme Court has consistently refused to interpret "opaque" language in federal criminal statutes, including the word "use," in such a "boundless" manner. *Dubin*, 599 U.S. at 114, 117, 128, 130–31 (declining to transform "everyday overbilling" into aggravated identity theft); *see also Van Buren v. United States*, 593 U.S. 374, 393 (2021) (declining to "attach criminal penalties to a breathtaking amount of

commonplace computer activity"); *Jones*, 529 U.S. at 857, 859 (declining to "make virtually every arson in the country a federal offense"); *Bailey*, 516 U.S. at 144 (rejecting a legal standard that "provides almost no limitation on the kind of [gun] possession that would be criminalized"). That the Second Circuit reserved this question—"whether there are any limits on the ways in which a fraudulently obtained passport may be 'used' in violation of the statute"—also undermines its persuasive value.

Finally, that court "assum[ed] arguendo" that "the statute only prohibits use of a passport in ways that are consonant with the ordinary functions of a passport." *Wilson*, 512 F. App'x at 77. And the court concluded that passports "are commonly used, and are issued to be used, not only in connection with international travel, but also for such purposes as identification and proof of citizenship." *Id*. But the court cited no authority for that proposition. While passports can be used as identification in certain non-travel contexts, that is not why they exist or why they are issued. In the FAQ section of the State Department's own website, it asks: "Who should have a valid U.S. passport?" The government answers: "You should have a U.S. passport if: You have family living or traveling abroad, You are thinking about a vacation

25

abroad, or You have a job that could require international travel." U.S. Dep't of State—Bureau of Consular Affairs, U.S. Passports, Passport Help, Frequently Asked Questions.[2] This answer confirms the ordinary understanding that passports are issued for purposes of international travel. Any use of a passport as proof of identity/citizenship derives from *that* purpose. Thus, using a passport as proof of identity/citizenship for non-travel purposes is "ancillary" or incidental to the "crux" of § 1542.

**b.**    In the end, though, this case does not require the Court to resolve whether § 1542 covers the "use" of a passport as proof of identity/citizenship *not* in connection with travel. That is so because there was no evidence that Mr. Sandburg "willfully and knowingly" used his expired passport to establish proof of his identity/citizenship. *See Browder*, 312 U.S. at 341 (explaining that "willfully and knowingly" means "deliberately and with knowledge and not something which is merely careless or negligent or inadvertent") (quotation marks omitted).

The evidence at trial showed that the passport agency requires renewal applicants to submit their most recent passport so it can be used

---

[2] https://travel.state.gov/content/travel/en/passports/passport-help/faqs.html

26

as proof of identity/citizenship. (DE 78:113–14, 117, 138, 141). Critically, however, there was no evidence that Mr. Sandburg—an ordinary person, not a government official—knew that the passport was required for that purpose. Indeed, there was no evidence that he was ever so advised.

The application instructions merely informed the applicant that they are eligible to use the renewal form if, among other things, they "can submit my most recent U.S. passport book." (DE 58-7, Exh. 9:1; DE 78:149). Mr. Sandburg could. The instructions did not explain *why* this was required, much less mention proof of identity/citizenship. (*See id*. at 2). Nor did the application form itself. (*See* DE 58-4, Exh. 6:4–5).

Moreover, unlike the application to obtain an original passport, the renewal application did not even have a box to check for proof of citizenship. (DE 58-1, Exh. 3:4; DE 78:107–08, 139–42). Thus, even the passport fraud prevention manager—the government's own witness—acknowledged at trial that renewal applicants may not know that their passport is required to prove identity/citizenship. (DE 78:151). After all, why *would* an ordinary person know that if they are never so informed? People are just following the instructions, not questioning their purpose.

In short, even if the non-travel "use" of a passport as proof of citizenship/identity could violate the statute, the government presented no evidence that an ordinary person like Mr. Sandburg "willfully and knowingly" used his expired passport in that manner merely by following the instructions on the form and submitting it with his application.

### B.    The evidence was insufficient for Count Two.

The first paragraph of § 1542 makes it a crime, punishable by up to ten years in federal prison, to "willfully and knowingly make[ ] any false statement in an application for passport with the intent to induce or secure the issuance of a passport under the authority of the United States, either for his own use or the use of another, contrary to the laws regulating the issuance of passports or the rules prescribed pursuant to such laws." In this case, there is no dispute that all of the information that Mr. Sandburg put on the 2021 renewal application was correct.

In fine print, however, the form required him to affirm five scripted representations. One of them was that he had "not knowingly and willfully made false statements *or included false documents* in support of this application." (DE 58-4, Exh. 6:4) (emphasis added). Mr. Sandburg signed his name. The government's theory was that he willfully and

28

knowingly made a false statement because, contrary to that representation, he submitted his passport listing a false place and date of birth. This theory fails as a matter of law because his passport was not a "false document." And, in any event, the theory fails as a matter of fact because there was insufficient evidence of Mr. Sandburg's *mens rea*.

### 1. An official passport is not a "false document."

In the district court, the government argued that, because the passport had been secured by false statements and incorrectly listed his place/date of birth, it was a "false document" "by definition." (DE 79:7). But the government never actually offered a "definition" of that phrase. And Mr. Sandburg had argued that the passport he submitted was not a "false document" "because the Government did not put on any evidence to show that the document itself was false." (*Id*. at 5). That was correct.

"Adjectives modify nouns—they pick out a subset of a category that possesses a certain quality." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 19 (2018). In the phrase "false document," the word "false" is an adjective that modifies the noun "document." Grammatically, then, the phrase "false document" is limited to a subset of documents that

are false. As the noun, the document *itself* is what must be false. So the question here is: what does it mean for a document to be a "false"?

To answer that question, the word "false" (like the word "use") must be read in context. In some contexts, "false" simply means "untrue." Black's Law Dictionary 635 (8th ed. 2004). That is what the word usually means in the context of, say, a "false statement." In other contexts, however, "false" means "[n]ot genuine" or "inauthentic." *Id.* So where the adjective "false" modifies the noun "document," the phrase might potentially mean one of two things. On the one hand, it might mean a document that contains untrue information. On the other hand, it might mean a document that is inauthentic. Under the latter meaning, Mr. Sandburg's passport would not be a "false document" because there is no dispute that it was an authentic, official passport. That it contained inaccurate information would not negate or affect its authenticity.

That is the correct meaning in the context of this passport application. There are several contextual indicators pointing that way.

First, and other than the passport, there is only one other "document" that may be submitted under the renewal application: a marriage certificate (if there has been a name change). (DE 58-7, Exh.

30

9:2). With respect to that document, the applicant is instructed to submit a "certified copy of your marriage certificate or court order (photocopies are not accepted)." (*Id*.). That the instructions require a "certified copy" and prohibit "photocopies" demonstrate that the application is focused on the authenticity of the document itself. As long as the applicant submits a marriage certificate/court order that is authentic—*i.e.*, an official, genuine document that has not been altered or forged—he has complied.

Second, in addition to those two "documents," applicants must also submit a recent photograph. The application requires the applicant to affirm that the picture is a "*genuine*, current photograph of me." (DE 58-4, Exh.6:4) (emphasis added). The instructions further emphasize the importance of authenticity, providing that "[a]ny photograph retouched so that your appearance is changed is unacceptable." (DE 58-7:2).

Third, providing false *information* is covered separately. Again, the application requires the applicant to affirm that he has "not knowingly and willfully made false statements . . . in support of this application." (DE 58-4, Exh.6:4). Because Mr. Sandburg did not make any false statements on the form, the government was forced to allege that his passport was a "false document" because it contained false *information*.

31

But the application did not prohibit the submission of "documents containing false information." It prohibited the submission only of "false documents." His authentic, official passport was the opposite of that.

### 2.    The evidence was insufficient as to *mens rea*.

In any event, the government still had to prove that Mr. Sandburg "knowingly and willfully" submitted a false document—*i.e.*, that he did so "deliberately and with knowledge," and not because he was "merely careless or negligent or inadvertent," *Browder*, 312 U.S. at 341. Thus, the government had to prove that he *knew* the representation he made—that he did not submit any "false documents"—was untrue. *See United States v. O'Bryant*, 775 F.2d 1528, 1535 (11th Cir. 1985) ("The crime is complete when one makes a statement one knows is untrue to procure a passport."). Here, the evidence was insufficient to prove that *mens rea*.

In light of the surrounding contextual indicators above, an ordinary person would not know that submitting an official, authentic passport qualified as submitting a "false document." But there is more than that.

The instructions to the application explained that a person was eligible to use the renewal form if several criteria were met. The only one at issue here was whether the applicant "can submit my most recent U.S.

passport book." (DE 58-7, Exh. 9:1). There was no qualification. As a result, Mr. Sandburg properly believed that he was eligible to use the form. Indeed, the fraud prevention manger testified that, "[i]f a normal lay person would go through this form and check yes to everything," they would "then believe that they were eligible to use the form." (DE 78:149).

That renewal form then required him to submit his passport, but there was no apparent mechanism for him to advise or notify the government that his passport contained inaccurate information. The fraud prevention manager suggested that, if someone was correcting mistaken information, they could "write a note down." (*Id*. at 150). But she did not explain where or how an applicant would do this—or, more importantly, how the applicant would *know* where or how to do this. Again, nothing in the instructions or the application informed applicants that they could "write a note" in order to correct information as part of the application process. And there was no space on the form to do so.

The upshot is that the government cannot prove that Mr. Sandburg was even being negligent or careless. It'd be one thing if the application explained how to correct information in a document being submitted; that might suggest a "false document" meant one with inaccurate information.

But it did not. Meanwhile, Mr. Sandburg otherwise did everything that was asked of him: the instructions informed him that he was eligible to use the renewal form; he filled out that form with his correct information; he followed the instructions to submit his most recent passport—an authentic, official passport; and there was no apparent way for him to advise anyone that his passport contained inaccurate information.

Nor was he was trying to conceal that fact. To the contrary, the place/date of birth that he put on the application form conflicted with the place/date birth on the passport he was submitting. This had the effect of alerting the government that his passport contained inaccurate information. And this furthered his undisputed goal: to correct his records. Under these circumstances—where he did everything required of him—the evidence was insufficient to prove beyond a reasonable doubt that he "willfully and knowingly" submitted a "false document."

\*   \*   \*

While Mr. Sandburg was sentenced to just a year of probation, the convictions here are felonies. As such, they are currently denying him the constitutional right to vote, as well as the privilege of traveling abroad (since his renewal application was denied). They should be reversed.

34

## CONCLUSION

Mr. Sandburg requests that the Court reverse his convictions.

Respectfully submitted,

HECTOR A. DOPICO
INTERIM FEDERAL PUBLIC DEFENDER

*/s/ Andrew L. Adler*
ANDREW L. ADLER
ASS'T FEDERAL PUBLIC DEFENDER
Counsel for Appellant
1 E. Broward Blvd., Suite 1100
Ft. Lauderdale, FL 33301
(954) 356-7436

35

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 6,939 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in New Century Schoolbook 14-point font.

*/s/ Andrew L. Adler*

**CERTIFICATE OF SERVICE**

I certify that on this 31st day of July 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, and it is being served this day via CM/ECF on Daniel Matzkin, Assistant U.S. Attorney, 99 N.E. 4th Street, Suite 523, Miami, FL 33132.

*/s/ Andrew L. Adler*